```
IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
```

| | |
|---|---|
| UNITED STATE OF AMERICA, )<br>)<br>)<br>vs.       )<br>)<br>JOEL M. COSEY,             )<br>)<br>Defendants.           ) | Criminal No. 14-73 |

AMBROSE, Senior District Judge

## OPINION

Defendant, Joel M Cosey, is charged with (1) conspiracy; (2) use of an unauthorized access device; (3) 2 counts of possession of device-making equipment; (4) possession of 15 or more unauthorized access devices; and (5) aggravated identity theft. These charges followed a stop of the vehicle driven by Defendant on August 9, 2014 but the Ross Township Police Department.

Defendant moves to suppress evidence seized in connection with the traffic stop, a search of Defendant, and the search of the vehicle Defendant was driving and Defendant's hotel room. A hearing was held on October 30, 2014 and all briefing was completed on January 19, 2015.

## Findings of Fact

1. On August 9, 2014, Officer Matthew Immekus of the Ross Township Police Department was at Nordstrom's Department Store at Ross Park Mall, instructing the store's loss prevention employees on handcuff techniques.

2. At that time, the store employees and Immekus were made aware of a female customer (later identified as Monique Morris), in the handbag department, who was randomly and quickly making selections. By video surveillance, he observed the female give the sales

associate 6 handbags and a Vanilla Visa Card for payment. The price of the handbags was $1,036.83. The sale was approved and the female signed the name "Shawna McKinley."

3. At the time, Immekus had experience investigating fraudulent credit and gift cards. From that experience, he knew that a Vanilla Visa card had a maximum dollar amount of $500.00.

4. Immekus next observed Morris purchase another handbag with a Master Card gift card. When the video surveillance was replayed and slowed down, he saw the numbers on the credit card and observed that the card had a flat finish on the left side and a shiny finish on the right.

5. From his experience, Immekus knew that the appearance of the card was consistent with a fraudulent card in that numbers would have to be sanded off before new numbers were placed on the card.

6. Also, by way of the video surveillance, Immekus saw Morris text "Joe," relating what she was doing in the store. "Joe" by a return text, instructed Morris to get handbags.

7. Morris then continued shopping, quickly selecting merchandise, which she attempted to pay for with the Vanilla Visa and Master Card gift cards. When the cards were rejected, Morris refused the offers made by the clerks to call the card issuers and demanded the return of the cards.

8. Morris exited the store, still under surveillance. Morris met Defendant and they put the merchandise she had into a vehicle. They then re-entered the mall.

9. Back in the store, Nordstrom's loss prevention employee determined that the real numbers on the credit card Morris had used to make the second handbag purchase were not the numbers Immekus observed on the card via video surveillance. The credit card company, when contacted, would only state that the account was recently closed.

10. Immekus continued to conduct surveillance on the vehicle in which Morris had put the merchandise. Through the car windows, he observed the packages and a hotel valet parking ticket in Defendant's name.

11. As he was looking into the vehicle, Immekus saw Defendant walking toward him and stopping ("freezing") when he observed Immekus looking in the car.

12. Immekus walked away from the car and looked in the other cars, attempting to appear less suspicious. Defendant then went to his car, where he deposited other packages and then returned to the mall.

13. Immekus remained outside the mall, receiving updates on the activities of Defendant and Morris inside the store from the loss prevention employees. When Immekus returned to the loss prevention room, he was informed that Defendant and Morris had attempted to make more purchases with 3 gift cards. Two of those cards were declined and Morris refused offers to call issuers and demanded return of the cards. Several other attempts by Morris to make purchases with gift cards failed and Morris again demanded return of the cards.

14. Morris left the store and was picked up by Defendant in the parking lot. Defendant and Morris then left the mall property together in the vehicle Defendant was driving.

15. Shortly thereafter, Immekus conducted a traffic stop of the vehicle, advised Defendant and Morris of his belief that Morris had used fraudulent gift and credit cards to make purchases. Morris produced the Vanilla Visa card that she had used to make purchases at Nordstrom.

16. After the stop, Immekus was informed by the loss prevention employees that they had confirmed that the credit card was fraudulent.

17. With this information, Defendant and Morris were handcuffed, searched, and placed in the police vehicle. The car was towed and then inventoried.

18. As a result of the items found during the search of Defendant, Morris, and the vehicle, a search warrant was issued for the search of the hotel room.

3

Defendant contends that Immekus' stop of the vehicle that Defendant and Morris occupied was conducted without probable cause or reasonable suspicion of criminal activity and constituted an illegal seizure of Defendant which mandates suppression of all evidence seized in the search of Defendant, his car and his hotel room. I disagree.

### **Conclusions of Law**

1. Immekus had both probable cause to arrest Defendant and reasonable suspicion that Defendant and Morris were involved in criminal activity.

2. The following information in Immekus' possession established both probable cause and reasonable suspicion:

    a.    Morris used a Vanilla Visa gift card (which Immekus knew to have a $500.00 limit) to make a purchase in excess of $1,000.00;

    b.    The number on a credit card used by Morris did not match the actual number of the credit card;

    c.    Subsequent attempts to use this card failed as the account closed;

    d.    One of the cards used by Morris appeared to be altered in such a way that original numbers had been sanded off in a way Immekus knew to be consistent with fraudulent cards;

    e.    Morris texted "Joe," apprising him when cards were declined and also of purchases she made;

    f.    When purchases were declined, Morris refused offers to call the card companies and demanded return of the cards;

    g.    "Joe," by text, instructed Morris to get handbags which she then selected quickly and without regard to price.

    h.    Morris and Defendant met in the mall parking lot and together put the merchandise in a vehicle.

    i.    Defendant "froze" as he saw Immekus looking in his car.

3. The totality of all the information Immekus possessed established both probable cause to arrest Defendant and reasonable suspicion that he was engaged in criminal activity.

4. Immekus lawfully stopped the vehicle transporting Defendant and Morris because he had both probable cause and reasonable suspicion that within the car were individuals engaged in criminal activity as well as stolen merchandise.

5. The evidence seized pursuant to the stop will not be suppressed.

6. The evidence seized from the hotel room and from Defendant will not be suppressed as fruit of the poisonous tree.

BY THE COURT:

s/ Donetta W. Ambrose
Donetta W. Ambrose
United States Senior District Judge